**UNITED STATES of America**

v.

**Robert Baer COHEN and Reynold Yannessa.**

**Crim. No. 77–458.**

United States District Court,
E. D. Pennsylvania.

July 18, 1978.

844

David W. Marston, U. S. Atty., Peter J. Smith, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Donald J. Goldberg, Philadelphia, Pa., for Cohen.

Joseph M. Fioravanti, Philadelphia, Pa., for Yannessa.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Defendants Robert Baer Cohen ("Cohen") and Reynold Yannessa ("Yannessa") were charged in a 20-count indictment with viola-

tions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* and a series of other crimes which formed the pattern of racketeering activity upon which the RICO charges were based.[1] On March 23, 1978, after a joint trial which lasted three weeks, the jury returned a verdict of guilty against Cohen on eleven of the thirteen counts in which he was charged. He was acquitted on Counts 5 and 11. Yannessa was found guilty on all counts in which he was charged.

Presently before the Court are Cohen's motions for judgment of acquittal, a new trial and in arrest of judgment, pursuant to Fed.R.Crim.P. 29(c), 33 and 34, respectively; and Yannessa's motions for judgment of acquittal or a new trial, pursuant to Fed.R. Crim.P. 29(c) and 33, respectively. For the reasons stated below, each of the defendants' motions will be denied.

A summary of the evidence presented at trial will be helpful to an understanding of this Opinion:[2] The School District of Bensalem Township ("School District"), in Bucks County, Pennsylvania, is the municipal body concerned with the administration of the system of public education within Bensalem Township. The Board of School Directors of the School District of Bensalem Township ("School Board"), an enterprise affecting interstate commerce, manages the operation of the public schools in the School District by establishing, equipping, furnishing and maintaining elementary and high schools and related facilities, and by exercising other powers, rights and privileges on behalf of the citizens and approximately 7,000 students of the School District. Cohen, an attorney and partner in the Philadelphia Law firm of Abrahams and Lowenstein, served the School Board as its solicitor from June, 1972, to the date of the indictment in October, 1977. Yannessa, a deputy sheriff in Bucks County from May, 1971, to January, 1977, was a member of the School Board, serving at various times as its President, Vice-President and member of the Building and Grounds Committee. One of the functions of the Building and Grounds Committee was the consideration and review of architectural firms seeking appointment by the School Board to design and supervise construction of public schools and related projects to be built by the School District. The need to design and construct three school facilities in Bensalem Township set into play the various events that ultimately resulted in the jury's verdict against these defendants. Those three school building projects are: (1) the Valley Elementary School ("Valley"); (2) the Robert K. Shafer Middle School ("Shafer"); and, (3) the Russell C. Struble Elementary School ("Struble"). The evidence concerning these projects is as follows:

## THE VALLEY SCHOOL

### 1. *The Yannessa-Baldino Extortion*

In early 1971, architects Joseph B. Baldino ("Baldino") and Anthony Macaluso ("Macaluso") formed the firm known as Baldino and Macaluso, Architects ("BMA"),

1. Cohen was charged in Count 1 with racketeering, 18 U.S.C. §§ 1961, 1962(c) and 1963; in Count 2 with conspiracy, 18 U.S.C. §§ 1961, 1962(d) and 1963; in Counts 5, 6, 8 and 10 with interference with commerce by use of extortion, 18 U.S.C. §§ 1951 and 2(a); in Counts 7 and 9 with mail fraud, 18 U.S.C. §§ 1341 and 2; in Count 11 with attempted interference with commerce by use of extortion, 18 U.S.C. § 1951; in Count 12 with obstruction of justice, 18 U.S.C. § 1503; in Count 13 with obstruction of criminal investigation, 18 U.S.C. §§ 1510 and 2; in Counts 19 and 20 with fraud and false statements under penalties of perjury, 26 U.S.C. § 7206(1).

 Yanessa was charged in Count 1 with racketeering, 18 U.S.C. §§ 1961, 1962(c) and 1963; in Count 2 with conspiracy, 18 U.S.C. §§ 1961, 1962(d) and 1963; in Counts 3, 4, and 6 with interference with commerce by use of extortion, 18 U.S.C. §§ 1951 and 2(a); in Count 13 with obstruction of criminal investigation, 18 U.S.C. §§ 1510 and 2; in Counts 14 and 15 with false declarations before grand jury, 18 U.S.C. § 1623; in Counts 16, 17 and 18 with fraud and false statements under penalties of perjury, 26 U.S.C. § 7206(1).

2. Neither Cohen nor Yannessa ordered a transcription of the notes of testimony in this case. In the preparation of this summary, therefore, the Court relies upon the transcript of 3 of the 47 witnesses who testified at trial and upon the Court's memory, its bench notes, the Clerk's minutes and other documents filed of record.

for the exclusive purpose of securing the architect's contract for the design and construction of Valley. On July 31, 1971, Baldino and Macaluso met with Yannessa and Dr. James Bardsley, Jr., another School Board member, to discuss, *inter alia,* the amount of money which would be necessary for BMA to pay to certain School Board members in exchange for their influence in helping BMA receive appointment as the architect for Valley. The architect's fee for the design and construction of Valley was $150,000, that amount being 6% of $2,500,-000, the projected cost of Valley. Although Yannessa initially demanded 10% of the architect's fee in return for assuring that BMA would be appointed to the Valley project, he and Baldino later agreed to settle for a "kickback" to Yannessa of 8.5% of the architect's fee, or $12,750.[3] However, on October 7, 1971, the School Board, at a "meeting of the whole," decided in an unrecorded, informal "straw vote" to appoint the more experienced architectural firm of Valente and Klaus for Valley. Unaware of this proposed appointment of another architect, on October 21, 1971, Baldino assembled $500 in "seed money" to give to Yannessa "up front" as a sign of BMA's good faith. The School Board ultimately did not appoint Valente and Klaus for Valley and, after reconsideration of the other 13 recommended architects, did appoint BMA for Valley in November of 1971.

Once the School Board officially awarded the Valley contract to BMA, Yannessa demanded and received from Baldino numerous payments in accordance with his "kickback" agreement with Baldino. Baldino maintained detailed records of these transactions with Yannessa [G–10A–D], which listed the dates the monies were assembled, the amount of the payments and the numbers of the checks used to assemble the monies. The procedure normally followed in the making of these payments was that Baldino would submit invoices to the School Board as each phase of the Valley project

was completed [G77–82], and the School Board would then authorize payment of the architect's fees to BMA. Part of each payment received by BMA was thereafter given by Baldino to Yannessa. For example, on May 18, 1972, the School District paid $36,000 to BMA for the Valley Schematic Phase Fee [G–77], $5,000 of which was subsequently given to Yannessa as partial payment under the "kickback" arrangement [G–10B]. Again, on September 21, 1972, the School District approved for payment $42,976 to BMA for architect's fees [G78–80], $5,000 of which was subsequently paid by Baldino to Yannessa [G–10B]. Baldino always made these payments to Yannessa by personally handing Yannessa the cash. These payments to Yannessa were usually made in Baldino's car in the parking lot of the Penn Sheraton Hotel in Fort Washington, Pennsylvania. On May 31, 1973, Baldino paid the last Valley "kickback" to Yannessa in the amount of $9,400, for a total of $25,000 in "kickbacks" to Yannessa, or 10% of the total architect's fee received by BMA in connection with the Valley project [G–10B]. None of these payments to Yannessa were recorded as income on Yannessa's federal income tax returns for the years 1972 or 1973 [G–247].

## THE SHAFER SCHOOL

### 1. *The Yannessa-Baldino Extortion*

In December, 1972, before construction started on the Valley project, Yannessa met with Baldino to discuss the prospect of BMA being appointed as the architect to design and supervise construction of Shafer. The architect's fee for the Shafer project was $270,000, that amount being, again, 6% of the projected cost of Shafer, which in this instance was $4,500,000. Yannessa demanded 10% of the architect's fee in exchange for the use of his vote and his influence, with other School Board members, to cause the School Board to appoint BMA as the Shafer architect. He also de-

---

**3.** Although Yannessa and Baldino agreed that BMA would make payments to Yannessa amounting to approximately 8.5% of the architect's fee, Baldino and Macaluso ultimately

paid over 10% of their fee to Yannessa, in order to appease Yannessa and other School Board members when problems developed with the Valley project.

manded an additional 1% of the architect's fee for himself. On January 11, 1973, Dr. Sanzotto, Superintendent of the School District, wrote to BMA to announce that the School Board had appointed BMA as the architect for the Shafer project [G–71], even though Sanzotto was "shocked" and "amazed" at the sudden selection of BMA, in light of numerous problems involving BMA developing at Valley. From January 26, 1973, to approximately April 12, 1974, Baldino paid Yannessa, under the Shafer arrangement, a total of $14,700, which total was comprised of $12,750 for the 10% "kickback" and $1,950 for the additional 1% for Yannessa [G–10D; see G38–59; G–83–85]. None of these payments to Yannessa were recorded as income on Yannessa's federal income tax returns for the years 1973 or 1974 [G–247].

At trial, Yannessa attacked the credibility of Baldino by calling witnesses who testified that Baldino had a poor reputation in the community for truth and honesty and by cross-examining Baldino with respect to his cooperation with the Government in exchange for being granted immunity. Specifically, Yannessa vigorously questioned Baldino about the accuracy and authenticity of the detailed records of his transactions with Yannessa [G–3 and G–10A–D]. Yannessa introduced evidence that he had taken an active role in the design and construction of Valley and Shafer, and had argued with Baldino numerous times in regard to the resolution of problems developing on the construction sites. Yannessa also introduced evidence of a growing animosity between Baldino and Yannessa in June of 1975, when Yannessa sought to have the School Board terminate Baldino's contract on the Shafer job [DY–6].

### 2. The Cohen-Baldino Extortion

Cohen became involved when Baldino met with Cohen to discuss alternative arrangements for payment. Cohen and Baldino agreed that Baldino would make subsequent "kickbacks" related to Shafer to Cohen, who would then distribute the money to those School Board members involved in the scheme. Baldino testified that on August 8, 1974, he gave Cohen $4,250 in cash in an elevator in the building in Philadelphia where Cohen's law office was located in the hope of salvaging the reputation of BMA with the School Board.

### 3. The Cohen-Chorlton Extortion

BMA was rapidly losing favor with members of the School Board because of problems connected with the architect's role that were developing at Valley and Shafer. For example, in July of 1973, the Valley project was delayed partly because of a surveying error [DC–1, 2]. Further, BMA was unable to secure preliminary approval from the Pennsylvania Department of Public Education of its plans for the design and construction of Shafer [DC–5; DC–7–12]. Finally, on June 11, 1975, the School Board terminated Baldino's contract for the Shafer project and paid BMA a termination settlement sum of $2,500 for expenses incurred by BMA as a result of this termination.

When it became apparent that the School Board planned to terminate its Shafer contract with BMA, Cohen called William B. Harvey ("Harvey"), owner of the consulting-engineer firm of Van Note-Harvey, to determine whether the architectural firm of Richard J. Chorlton, Associates ("Chorlton"), would be interested in finishing the Shafer project, in view of the work Chorlton had performed on the Struble school. However, Cohen conditioned the award of the Shafer contract to Chorlton upon a 10% "kickback" of the architect's fee by Chorlton to Cohen [N. T. Harvey 34]. When advised of this, Chorlton agreed to the payment of the "kickback" but was unwilling to advance one-third of the "kickback" as required by Cohen [N. T. Harvey 34]. Cohen thereafter agreed to take a lesser amount [N. T. Harvey 35]. After Chorlton gave Harvey the payment in cash; Harvey delivered the cash to Cohen at Cohen's home in Philadelphia [N. T. Harvey 36]. Chorlton's firm was not awarded the Shafer project, despite his prior work at Struble, his payment to Cohen and the repeated

efforts at four School Board meetings to have his firm appointed. [*See* DC–138; N. T. Harvey 37.]

### 4. *The Cohen-Stabler Extortion*

On September 12, 1975, when it was apparent that the School Board would not award Chorlton the contract to finish the Shafer school, Cohen called a client, Norman Katz ("Katz"), co-founder and President of Penn State Engineering ("PSE"), a wholly owned subsidiary of Van Note-Harvey, to determine whether Katz knew of another architect besides Chorlton who would complete the Shafer project and who would pay a 10% "kickback" to be awarded the contract [N. T. Katz 64]. Accordingly, Katz called Arthur L. Stabler ("Stabler") and informed him that, if he wished to receive the $170,000 lump-sum Shafer contract, Stabler would have to pay a 10% "finder's fee" in the amount of $17,000 [N. T. Katz 66]. Stabler agreed to pay the "finder's fee" in order to receive the Shafer contract, but told Katz that he could only pay $4,250 in advance, rather than $8,500 [N. T. Katz 66]. At Cohen's direction, Stabler sent a letter to Yannessa [G–130], requesting an interview with the School Board for consideration of his firm for the completion of the Shafer contract [N. T. Katz 68, 72]. On October 6, 1975, Katz telephoned Stabler to inform him that the School Board would award Stabler the contract to finish Shafer [see G–171] and to arrange the initial payment of $4,250. On the same day, Stabler wrote a check payable to PSE [G–137], in the amount of $4,250, and mailed the check to Katz at PSE [N. T. Katz 79, 81]. Within a period of six months after receipt of these payments, PSE mailed an invoice to Stabler, backdated to September 2, 1975, in the amount of $4,250 "for services rendered," even though no services had been rendered by PSE to Stabler [G–140; N. T. Katz 90–91]. On October 10, 1975, Katz deposited Stabler's $4,250 check into PSE's checking account [N. T. Katz 71]. Katz then directed the PSE bookkeeper to write two PSE checks— one in the amount of $2,250 and payable to

J. B. Williams, and the other in the amount of $2,000 and payable to Dean Keith. [G–138; G–139; N. T. Katz 82.] The names J. B. Williams and Dean Keith were among the fictitious names used by Katz and PSE co-founder Guy E. Croyle ("Croyle") to convert PSE funds to their own use [N. T. Katz 83]. On the afternoon of October 10, 1975, Croyle endorsed the two checks made payable to the fictitious Williams and Keith and cashed them at the Boalsburg Bank, where he had previously cashed other fraudulent checks [N. T. Croyle 12–13; N. T. Katz 84]. Croyle then gave to Katz the cash received from the two checks, in the total amount of $4,250. Katz then handed Cohen the money in Cohen's law office sometime during the following week [N. T. Katz 85–86]. This payment represented the advance payment by Stabler of the "finder's fee" for Shafer. Katz kept no portion of the $4,250 [N. T. Katz 88]. At trial, Cohen's testimony was to the effect that School Board members regularly asked him if he could recommend architects for the various schools being constructed within the School District and that he felt such recommendations were within the scope of his duties as solicitor for the School Board. Cohen also testified that the letters and calls which he received from Stabler focused upon the terms of the contract for Shafer, because Stabler's appointment occurred after work on Shafer had started. Cohen also testified that he never received $4,250 from Katz or anyone else as a "finder's fee" in respect to Stabler's appointment as architect for Shafer.

## THE STRUBLE SCHOOL

### 1. *The Cohen-Yannessa-Chorlton Extortion*

On January 9, 1973, Cohen called Katz at PSE to determine whether PSE, or another architect, could perform the architectural services to design and supervise construction of the Struble school. The architect's fee for Struble was to be $300,000, which was again 6% of the projected cost of Stru-

ble [4] [N. T. Katz 19–20; G–109]. Cohen demanded 10% of the architect's fee from Katz in exchange for use of Cohen's influence, together with that of certain School Board members, to have the School Board appoint a particular architect for the Struble project [N. T. Katz 20–21, 24]. Katz called Harvey, the owner of both Van Note-Harvey and PSE, to discuss Cohen's offer. Harvey recommended Chorlton to be the Struble architect [N. T. Katz 21–22; N. T. Harvey 8–10]. Pursuant to Cohen's instructions, Katz wrote and mailed a letter dated January 10, 1973 [G–107], to Jeffrey Kolodney, another School Board member, and suggested Chorlton's architectural firm for the design and construction of Struble [N. T. Katz 23]. The School Board appointed Chorlton's firm as the Struble architect in February of 1973 [G–106]. Katz and Cohen subsequently discussed, on at least six occasions, the arrangements for Chorlton's payment of money to Cohen [N. T. Katz 26]. Cohen wanted the initial $10,000 to be paid promptly [N. T. Katz 26; G–111, G–114], and Harvey, after being reassured by Cohen that Chorlton would get the job if the money were paid, told Katz in mid-March of 1973 to have PSE pay the money to Cohen as if PSE were paying a valid legal fee for professional services rendered by Cohen's firm [N. T. Katz 27–33; G–115, G–116]. On March 29, 1973, Katz directed the PSE bookkeeper to write a check for $10,150 [5] on PSE's regular business account [G–122] and payable to Abrahams and Lowenstein for legal services [N. T. Katz 33–35]. After the $10,150 PSE check was deposited in Abrahams and Lowenstein's Fidelity Bank account [G–157], Cohen wrote a letter to Katz, backdated to February 1, 1973 [G–117], which included an itemization of the nonexistent professional legal services allegedly rendered by Cohen to PSE [N. T. Katz 37, 39].

In June of 1973, Chorlton asked Katz to have PSE send fictitious invoices to Chorlton's firm showing services rendered by PSE to Chorlton [N. T. Harvey 18]. In April of 1974, Katz sent such invoices to Chorlton, backdated to March 20, 1973, in the amount of $7,150 [G–124; G–125A]. The money which PSE paid to Cohen on behalf of Chorlton was recorded by PSE as a $7,150 credit against the $20,000 amount PSE legitimately owed Chorlton [N. T. Katz 51, 63]. Katz also sent false invoices to Van Note-Harvey, also backdated to March 20, 1973, in the amount of $2,850, showing professional services supposedly rendered by PSE to Van Note-Harvey [G–127; N. T. Katz 58–60, 63].

After the School Board began authorizing payment to Chorlton for architect's fees in connection with the Struble contract, Cohen or Katz would call Harvey for "kickback" payments to Cohen [N. T. Harvey 20–21]. Harvey personally made approximately six or eight cash payments to Cohen in Cohen's law office, and Chorlton personally made one cash payment to Cohen in Cohen's law office [N. T. Harvey 22–24]. Harvey calculated that the amount of these payments totalled as much as $18,150 [N. T. Harvey 25]. Chorlton estimated that the total amount of the payments made on his behalf to Cohen in return for Cohen's securing the appointment of Chorlton as the Struble architect was between $12,000 and $15,000.

In his defense, Cohen testified that the reason he called Katz was to inquire about the names of competent architects to be interviewed by the School Board for Struble, in response to Kolodney's request for a new architect. He further testified that, while he never asked any School Board member to vote for Chorlton, he hoped that his discussions with Harvey with respect to the scope of the Struble project would eventually develop into an attorney-client relationship between Cohen and Van Note-Har-

---

4. The actual cost for the design and construction of Struble was $2,900,000, rather than the projected $5,000,000. Accordingly, the 6% architect's fee amounted to $174,000 rather than $300,000.

5. An extra $150 was added to the $10,000 initial payment by PSE, on behalf of Chorlton for Cohen, because Chorlton felt that a check for $10,150 would appear less conspicuous than a check for $10,000 [N. T. Harvey 15, 18].

vey because of his belief in the prestige associated with retaining out-of-town corporate clients. Cohen also testified that the bill Abrahams and Lowenstein sent to PSE in the amount of $10,150 was a legitimate invoice for professional legal services Cohen had rendered over a two-year period, and that he never received any illegal "kickbacks" from Katz or PSE on behalf of any architect seeking a contract for the design and construction of a school within the School District of Bensalem Township. Further, Cohen testified that he never requested nor received any illegal payments from Harvey or Chorlton and that the only money he received from Chorlton concerned an emergency matter which arose during the construction of Struble.

### 2. Obstruction of Criminal Investigation; False Statements

The Government presented evidence at trial that, after the PSE check for $10,150 made payable to Abrahams and Lowenstein was deposited in the firm's Fidelity Bank account [G–157], Cohen wrote two checks totalling $10,150 [G–160, G–162]. The first check in the amount of $8,333.30 [G–160], dated April 6, 1973, and payable to Yannessa's nephew, William Herbert ("Herbert"), was cashed by Herbert after he was asked by Yannessa to "pick up some money" from Cohen. Pursuant to Yannessa's instructions, Herbert gave the cash proceeds of the check he received from Cohen to Yannessa that evening. The second check in the amount of $1,816.70 [G–162], dated April 11, 1973, and payable to Abrahams and Lowenstein, was deposited in a different Abrahams and Lowenstein account with the Central Penn National Bank.

In November of 1976, Yannessa called Herbert to advise him that the federal grand jury was investigating certain activities of the School Board, and that the $8,333.30 check which Herbert had cashed for Yannessa might be involved. Pursuant to Yannessa's direction, Herbert called and met with Cohen in December of 1976, to discuss the $8,333.30 check, the grand jury investigation and the story Herbert was to

tell if Herbert were subpoenaed to testify. Cohen advised Herbert to state that the $8,333.30 check was the return of funds held in escrow by Abrahams and Lowenstein as a bond required by the Rishell Development Company for an electrical contracting job in central Pennsylvania. Herbert gave this version to the Internal Revenue Service ("IRS") in June of 1977, because he wanted to protect his uncle, Yannessa. In July of 1977, after Herbert was contacted by the Federal Bureau of Investigation ("FBI") and subpoenaed to testify before the grand jury, he met with Cohen and Yannessa to discuss the investigation and his testimony. Herbert refused to continue telling the Rishell story, even though Cohen advised him that he, Herbert, would eventually be granted immunity. On September 15, 1977, Yannessa appeared before the grand jury and testified that the $8,333.30 check which Cohen gave Herbert was the return of money Yannessa had given Cohen to put in escrow for an upcoming electrical contracting job with the Rishell Development Company in central Pennsylvania [G–244].

In his defense, Cohen testified that Yannessa and Herbert had given him $8,000 and $5,000, respectively, for a performance bond required in order for Herbert to be awarded the electrical contracting job with Rishell. Cohen gave the money to Katz, the consulting engineer for the Rishell project since 1971, with the expectation that Katz would attempt to acquire the contract. Because Rishell had problems with a mortgage company, the project failed and the electrical contract never materialized. Yannessa pressured Cohen for repayment of the $13,000, and Cohen, in response, demanded the money from Katz. Because Katz did not repay the $13,000, Cohen wrote checks in the amounts of $8,333.30 [G–160] and $5,215 [DC–132], to Yannessa and Herbert, respectively, as repayment of the $13,000, plus interest, which amount was then held by Cohen in escrow. However, Katz testified at trial that Cohen never game him $13,000 to use as a performance bond in order to acquire the electrical job with Rishell [N. T. Katz 236].

Further, Donald C. Rishell, President of the Rishell Development Company, testified that he never received any letter or other communication from Cohen, Yannessa or Katz that funds were being held in escrow to secure a contract with his project.

### 3. *Obstruction of Justice*

In November of 1976, the grand jury subpoenaed the books and records of PSE in connection with its investigation of the Bensalem Township School District [N. T. Katz 100; N. T. Croyle 16]. On November 4, 1976, pursuant to the direction of Cohen and Katz, Croyle brought the subpoenaed documents to Cohen's law office before turning them over to the grand jury [N. T. Croyle 17–18]. After reviewing the PSE checks and ledgers, Cohen removed three checks and the Abrahams and Lowenstein file, including an invoice from that law firm to PSE in the amount of $10,150 [N. T. Croyle 19–20]. One week later, Katz went to Cohen's home to get the file which Cohen had retained [N. T. Katz 102; N. T. Croyle 22]. At that time, Cohen gave Katz the original $10,150 invoice, as well as an altered copy [6] of the original [G–118; G–136; N. T. Katz 103, 113–114], and directed Katz to alter the original invoice [G–118] by backdating it to February 19, 1973, and by writing the PSE secretary's notations on the face of the invoice [N. T. Katz 103, 121–123; N. T. Croyle 24]. The altered invoice for $10,150, which was later returned to PSE's Abrahams and Lowenstein file, was not a true invoice for services rendered or monies held [N. T. Katz 128].

Cohen testified that, although he might have xeroxed some documents from PSE's books and records, he did not remove any document prior to Croyle's delivery of the subpoenaed records to the grand jury. Cohen also testified that PSE's Abrahams and Lowenstein file was not among the records brought to his office by Croyle and that he never gave any altered invoice, or instructions to alter an invoice, to Katz.

### ADDITIONAL WORK: VALLEY AND STRUBLE

#### 1. *The Cohen-Chorlton Attempted Extortion*

The Government produced evidence at trial that Cohen called Harvey in June of 1976 to inform him that the School Board was looking for an architect to perform additional work at Valley and Struble, and to offer the contracts with the condition that a 10% "kickback" would be paid by the architect [N. T. Harvey 39]. Chorlton, after being informed by Harvey of the proposed contracts, agreed to the payment of a "kickback" and met with Cohen to discuss the details [N. T. Harvey 39]. Because the architect's fees for the contracts totalled $20,000, Cohen demanded $2,000 from Chorlton for his influence in the School Board's appointment of Chorlton to do the additional work [N. T. Harvey 41; N. T. Katz 96]. Chorlton never paid the $2,000 to Cohen because Chorlton was experiencing serious financial problems [N. T. Harvey 40–41; N. T. Katz 96].

### MOTIONS FOR JUDGMENT OF ACQUITTAL

 Cohen and Yannessa each renews his motion for a judgment of acquittal raised at the close of the Government's case and at the close of all the evidence, pursuant to Fed.R.Crim.P. 29. In reviewing the denial of a motion for judgment of acquittal, we must determine whether the evidence, when viewed in a light most favorable to the Government, was such that a jury could have found beyond a reasonable doubt that the defendants were guilty as charged. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Miah,* 433 F.Supp. 259, 264 (E.D.Pa.1977), *aff'd mem.,* 571 F.2d 573 (3d Cir. 1978). Evidence which is sufficient to support a conviction need not be direct, and such conviction may be supported by circumstantial evidence. *United States v.*

---

**6.** Cohen added the words "For all costs, monies held and" before the words "for professional services rendered" on the invoice in order to be consistent with the Rishell story of funds held in escrow for Yannessa [N. T. Katz 125–126].

*Miah, supra,* 433 F.Supp. at 264. In reviewing testimony for determining a Rule 29 motion, questions of the weight of the evidence or of the credibility of the witnesses are foreclosed by the jury's verdict. *Id.* at 264. *United States v. Goichman,* 407 F.Supp. 980, 991 (E.D.Pa.), *aff'd,* 547 F.2d 778 (3d Cir. 1976).

■ In support of their respective motions,[7] Cohen and Yannessa each argue that the evidence produced by the Government at trial was insufficient to sustain a conviction as a matter of law. Neither Cohen nor Yannessa filed a brief in support of his motion for judgment or acquittal. More specifically, Cohen argues that the evidence was insufficient to support the jury's verdict of guilty on Count 19 with respect to Cohen's 1974 federal income tax return because Cohen was acquitted by the jury on Count 5, which charged Cohen with extortion of Baldino in exchange for the Shafer contract. [*See* note 7, *supra.*] In support of this argument, Cohen stated at oral argument before this Court on April 27, 1978, that IRS Agent Deery testified at trial that the only money involved in the 1974 tax year was the $4,250 which Baldino allegedly gave Cohen in August, 1974. [*See* N. T. Post-Trial Arg. at 3.] In response, the Government argues that, although Cohen was acquitted on Count 5, the jury heard evidence of payments to Cohen from Chorlton in 1974 in connection with the construction of Struble. The Government also argues that the jury may have believed that Cohen received $4,250 from Baldino in August of 1974, despite the failure of the Government to prove all of the elements of the offense charging Cohen with obstruction of commerce by extortion. Specifically, the Government contends that Baldino's initiation of the contact with Cohen for the purpose of keeping BMA in good standing with the School Board may have undermined the jury's finding of extortion under the Hobbs Act, which was a necessary element to find before a jury could convict Cohen on Count 5. [*See* N. T. Post-Trial Arg. at 51–53.]

In support of his motion, Yannessa argues that the Government failed to present sufficient evidence from which the jury could find Yannessa guilty of Count 6, the extortion of Chorlton during the Struble project, and of Count 13, the obstruction of a criminal investigation by Yannessa's contacts with Herbert. Specifically, Yannessa argues that, even if the entire testimony of Herbert were believed, there was insufficient evidence to find Yannessa guilty of obstruction of a criminal investigation or the extortion of Chorlton. [*See* N.T. Post-Trial Arg. at 49.] Further, Yannessa contends that the entire case against him hinged upon the credibility of Baldino and that Baldino's credibility was impeached to the extent that the evidence presented was insufficient to support a conviction. In response, the Government argues that, with respect to Count 6, the jury heard ample evidence involving the Chorlton extortion, including the involvement of PSE, Katz and Croyle, and Herbert's delivery of the cash proceeds to Yannessa. With respect to Count 13, the Government argues that sufficient evidence was presented to the jury to support a conviction through the testimony of Herbert, Yannessa grand jury testimony and other documents. [*See* N.T. Post-Trial Arg. at 61–62.]

■ First, we hold that the evidence presented at trial was sufficient for a jury to conclude beyond a reasonable doubt that Cohen received "kickbacks," which were not reported as income on his 1974 federal income tax return. The Government presented the testimony of Baldino and Chorlton to prove that payments were made to Cohen in 1974, and also presented evidence that none of these payments were reported as income on Cohen's 1974 tax return. Even

---

7. Cohen and Yannessa raise several grounds in support of their Rule 29 motions by incorporating by reference the arguments raised in support of their Rule 33 motions for a new trial. We note, however, that argument that the evidence presented at trial was insufficient to support a conviction as a matter of law is the only ground properly raised in support of a Rule 29 motion for a judgment of acquittal. *See United States v. Miah,* 433 F.Supp. 259, 264 n.3 (E.D. Pa.1977), *aff'd mem.,* 571 F.2d 573 (3d Cir. 1978).

though the jury acquitted Cohen of the Baldino extortion in Count 5, presumably because the Government failed to prove beyond a reasonable doubt each element of that alleged extortion, we hold that the evidence, as outlined above, was sufficient for the jury to conclude beyond a reasonable doubt that Cohen nevertheless accepted the $4,250 payment offered by Baldino to salvage BMA's reputation with the School Board. Cohen's motion for a judgment of acquittal will, therefore, be denied.

■ Second, we hold that the evidence presented by the Government at trial was sufficient for a jury to conclude beyond a reasonable doubt that Yannessa received an extortionate payment from Chorlton, which was mailed on his behalf by PSE to Cohen and given by Cohen to Herbert for delivery to Yannessa. We hold, further, that the evidence presented at trial was sufficient for a jury to conclude beyond a reasonable doubt that Yannessa obstructed, or aided and abetted in the, obstruction, of the grand jury investigation of their activities in connection with the School Board. Herbert testified at trial that it was pursuant to Yannessa's direction that he called and met with Cohen to discuss the $8,333.30 check and the false story he was to relate if he were subpoenaed to testify before the grand jury. Likewise, Herbert testified that Yannessa was present at the meeting Herbert had with Cohen in July of 1977, where Cohen urged Herbert to continue telling the Rishell story. Further, the credibility of Baldino, Herbert or any other witness is a question of fact for the jury and such questions are foreclosed at this time by the jury's verdict of guilty against Yannessa. For the reasons stated above,

Yannessa's motion for a judgment of acquittal will be denied.

## MOTIONS FOR A NEW TRIAL

Cohen and Yannessa raise numerous grounds in support of their motions for a new trial, pursuant to Fed.R.Crim.P. 33.[8] We will discuss only the alleged trial errors deemed meritorious: (1) the Court's denial of Cohen's motions for severance, in light of Yannessa's exercise of his constitutional right not to testify in his defense; (2) the Court's mid-trial dismissal of a juror; and, (3) the Court's limitation upon Yannessa's cross-examination of Baldino.

### Severance

■ Defendant Cohen argues again the point that it was error for the Court to deny his motion for severance. The Court will only consider here matters not previously ruled upon in pretrial motions for severance. Cohen argues that his renewed motion for severance should have been granted when it became evident, during the course of the trial, that Yannessa was to exercise his right not to testify in his own defense and when the Government introduced Yannessa's grand jury testimony to the trial jury. Cohen's argument in support of this ground is that a severance is warranted because the introduction into evidence of Yannessa's grand jury testimony was the equivalent of the introduction of a *Bruton*[9] statement being introduced, to the prejudice of Cohen. Cohen states that the Government's proof against codefendant Yannessa, in respect to the perjury charge against Yannessa only in Count 15, was the offer of Yannessa's grand jury testimony

---

8. Neither Cohen nor Yannessa filed memoranda of law in support of their motions for a new trial prior to the oral argument held before this Court on April 27, 1978. Subsequent to that argument, Cohen and the Government filed post-argument briefs on May 4, 1978, and May 11, 1978, respectively, which focused solely upon the issues of Herbert's credibility and upon defendants' requests for a severance. Cohen and Yannessa argue in support of their respective motions for a new trial that the Court erred in the pretrial denial of Cohen's motion for a severance, Yannessa's motion to

suppress his grand jury testimony and Yannessa's motion to dismiss the first three counts of the indictment. For the reasons stated in our Memorandum ·and Order denying these motions, *United States v. Cohen*, 444 F.Supp. 1314 (E.D.Pa.1978), we shall deny ·defendants' present motions for new trial to the extent that they depend upon the same grounds previously ruled on.

9. *See Bruton v. United States,* 391 U.S. 123, 129, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

that furnished the "escrow" arrangement as the explanation for the $8,333.30 check involving Cohen and Herbert. It was the Government's intention to have the jury compare that grand jury explanation by Yannessa with the testimony provided at trial in order to cast doubt on the "escrow" version. Simply stated, the Government urged the jury at trial that it should return a verdict of guilty against Yannessa on the perjury count, because the evidence established beyond a reasonable doubt that the "escrow" arrangement was a fabrication and, consequently, perjury had been proven. It is Cohen's argument here that the admission of that testimony was prejudicial to him because, in effect, it permitted the trial jury to be influenced by the finding of the grand jury that perjury had been committed; hence, usurping the trial jury's prerogatives. In response, the Government argues that the grand jury indictment of Yannessa for making false statements to the grand jury is distinguishable from *Bruton,* where a statement or confession of a codefendant who did not testify at trial was introduced at the trial against the defendant. Further, the Government argues that there was no need for a severance, because the Court instructed the jury that the indictment should not be considered as evidence and that the evidence of the perjury charged against Yannessa should be compartmentalized with respect to Yannessa only.

The common sense answer to the rationale Cohen advances is that every grand jury makes a finding of some kind consistent with there being probable cause that a crime has been committed; otherwise, an indictment would not be returned. There is always the prospect that a trial jury's findings following trial will in some way be influenced by the grand jury's deliberations and ultimate findings. This jury was instructed time and time again from the beginning of the trial to the end that the indictment was not evidence, and Cohen concedes this. [*See* N. T. Post-Trial Arg. at 10.] The cautionary instructions given by the Court to the jury to disregard the indictment as evidence, and to consider only

the evidence presented at trial, provide protection against the possibility that the trial jurors will give undue weight to the determinations of the grand jury. *United States v. Pacente,* 503 F.2d 543, 547–548 (7th Cir.), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974); *see United States v. Homer,* 545 F.2d 864, 868 (3d Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977). Specifically, at the time during trial when the Yannessa grand jury testimony was about to be read and when Cohen made his motion for severance, the Court explicitly instructed the jury, at Cohen's request, that they should not consider that grand jury testimony in the case against defendant Cohen. [*See* N.T. Post-Trial Arg. at 8.] This *Bruton* argument was not made before trial, although it was perfectly plain by a reading of the indictment that proof of the perjury count would be advanced to the trial jury. Furthermore, the jury was admonished repeatedly that neither defendant had an obligation to testify on their own behalf and, if either defendant chose not to, that such election should not be considered adversely by the jury. Armed with all of the necessary elements, therefore, Cohen chose not to raise this argument until after the verdict was in, which this Court considers to be too late even if there were merit to the argument.

In addition to the reasons stated in our pretrial Memorandum and Order denying Cohen's motion for severance, *United States v. Cohen,* 444 F.Supp. 1314 (E.D.Pa. 1978), we hold that severance was not warranted in this case because it is speculative to assume that the jury did not, or could not, follow the instructions of the Court.

*Mid-Trial Dismissal of Juror*

The recitation of facts presented at this time in this Opinion are derived by the Court from the Notes of Testimony of the Post-Trial Argument of April 27, 1978, at pages 14 to 41.

■ During the course of this trial, one of the jurors approached the Courtroom Deputy and stated that, because he worked

for a construction company and believed that the "kickbacks" described in this case were widespread throughout the industry, he had already decided that Cohen and Yannessa were not guilty of a crime no matter what the law might be. When this statement was brought to the attention of counsel by the Court, it was agreed by all that, if the report from the Courtroom Deputy was correct, it furnished a basis for the juror's disqualification and removal. There then ensued a discussion between the Court and counsel of the various alternatives, after which it was agreed by the Court and all counsel that the Court would question juror number 5 the following morning, *in camera,* and if the Court determined that the juror's mind was made up and that the juror had not discussed his preconceived notions with anyone else, the juror would be advised by the Court that he was excused from further service and that from that instant on he would have no further contact with any of the other jurors. The Court advised counsel following this agreement on the afternoon of March 15, 1978, that they should think over the understanding and advise the Court if they had any objections to the agreed-to procedure the following morning. Cohen's counsel reported this agreement to his client that afternoon. The following morning, the Court, hearing no objection, asked the Courtroom Deputy to bring juror number 5 to the Court's chambers so that the Court could discuss, *in camera,* the question of the juror's preconceived notion of the case, as well as the extent to which he may have discussed this with others. The Court discussed this with the juror, *in camera,* and the juror confirmed that, because of his involvement in the construction industry, his mind was made up. He also advised the Court that he had not had any discussion with any other jurors. The Court advised the juror to remain in chambers and not return to the jury assembly room. The

Court advised the Courtroom Deputy that, after the remainder of the jury was impaneled in the courtroom, the Deputy should escort juror number 5 from the Court's chambers in order to assure no further contact with the members of the jury still sitting. In keeping with the agreement, this was done, and when the trial resumed at noon that day, an alternate juror was, without further comment or explanation of any kind, directed to assume the seat of juror number 5.[10]

There was no objection at that time nor other requests of any kind to the Court concerning this incident, until the issue was raised by Cohen in his post-trial motions. Cohen argues two points. The first is that he should have been present during the discussion concerning juror number 5 and, secondly, the matter should have been on the record. There are two instances involving this matter that could apply to Cohen's present position. The first was on the afternoon of March 15, 1978, when the Court met with counsel in the corridor outside the courtroom and reported to them what the Courtroom Deputy had relayed to the Court concerning juror number 5. The second instance would have been the following morning when the Court, in accordance with the agreement of counsel, discussed with juror number 5, *in camera,* the question concerning his statement to the Courtroom Deputy.

In regard to the first instance in the corridor, Cohen's counsel, together with other counsel, participated in that discussion without objection, without request that his client be present or without request that the Court Reporter take down everything that was said. Furthermore, Cohen's counsel, following the agreement as to how the matter should be handled, returned to the courtroom and discussed this with his client, following which there was neither objection nor request of any kind by his client for him

---

10. The pertinent portion of the transcript of March 16, 1978, the day the juror was disqualified from further service, reads as follows:

THE COURT: Move the next alternate into Mr. Weaver's seat.

THE CLERK: Mrs. Jaraczewski, would you please move over to Seat No. 5?
THE COURT: All right, Mr. Smith, let's have your next question. . . .
[*See* N.T. Post-Trial Arg. at 21–23.]

to be a participant in the discussion nor that it be a matter of record. It should be noted also that the Court suggested that counsel consider the agreement over the evening recess and advise the Court the following morning, before the Court was to speak to juror number 5, if counsel had any further objections. No objections from either Cohen or his counsel or any other counsel were made. Under these circumstances, it seems perfectly plain that the defendant had an opportunity to be included in the discussions and to register any objection he may have had to the agreement or to request that any part of the episode be placed on the record. The second instance where the defendant may be said to have had a right to be present or to have something of record occurred the next morning when the Court, in keeping with the agreement, discussed with juror number 5 in chambers the question of that juror's partiality. It should be noted that Cohen concedes that the discussion was to be *in camera* and, for that reason, little more need be said as to the frivolity of his present contention that he should have been present, if *in camera* has any meaning at all.[11] Again, it should be noted that, following the *in camera* discussion and the release of juror number 5 by the Court by reason of the juror's partiality, the agreed-to procedure of replacing juror number 5 with an alternate was followed and this was in the record. Cohen had an opportunity at that time to make further objection or other request, yet he failed to do so.

Under all of the foregoing circumstances, it is incredulous that the defendant—an experienced lawyer with the benefit of competent, experienced counsel and the benefit of full knowledge of what was transpiring, as well as opportunity to speak to the issue—could through his counsel agree to a procedure and then, when that is followed, later complain that some other procedure should have been followed.

11. At oral argument, the Court asked counsel for Cohen whether Cohen was entitled to be present at the *in camera* interrogation which counsel had requested to be conducted. In response, Cohen's counsel stated:

*Cross-Examination of Baldino*

Yannessa argues that the Court erred in refusing to permit extensive cross-examination of Baldino with respect to Baldino's federal income tax returns on the issue of the improbability of Baldino's financial capacity to make "kickback" payments to Yannessa. Specifically, Yannessa contends that the Court's limitation of his cross-examination of Baldino prevented Yannessa from demonstrating Baldino's lack of credibility, because the "kickbacks" which Baldino testified he gave to Yannessa exceeded Baldino's income as reported on his tax returns. The Government argues, in response, that the limitation of the cross-examination of Baldino was well within the Court's discretion, because the proposed line of questioning was premised upon unwarranted and speculative assumptions regarding Baldino's sources of income. Further, the Government argues that, despite Baldino's admission during cross-examination that the payments to Yannessa constituted a substantial financial drain on Baldino's income, the evidence presented at trial was sufficient for the jury to find that Baldino was financially capable of making the "kickbacks" to Yannessa.

▪▪▪▪ It is well settled that the trial judge has wide discretion in determining the permissible scope of cross-examination of a witness. *United States v. Dansker,* 537 F.2d 40, 60 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In this case, the Court limited Yannessa's attempt to cross-examine Baldino on the basis of his tax returns, because the offer of proof demonstrated that the issue was of such a complex nature that expert testimony, rather than the lay testimony of Baldino, was required to explicate the matter. In addition to the reasons stated on the record for limiting Yannessa's cross-examination of Baldino, we find that the Court did not err in limiting Yannessa's

I did not expect Mr. Cohen to be present. I didn't expect to be present. Nor did I expect counsel to be present.

[*See* N.T. Post-Trial Arg. at 41.]

proposed cross-examination of Baldino because the proposed cross-examination improperly attempted an analysis of complex tax returns which were not personally prepared by the witness being cross-examined; *i. e.,* Baldino. Further, the Court at sidebar ruled that Yannessa could offer the line of testimony in his own case by whatever witnesses he chose. We hold, therefore, that limitation of Yannessa's cross-examination of Baldino on this issue did not constitute reversible error.

For the reasons stated above, the Court finds that the trial errors alleged by Cohen and Yannessa are without merit. Accordingly, Cohen's and Yannessa's motions for a new trial pursuant to Fed.R.Crim.P. 33 will be denied.

MOTION IN ARREST OF JUDGMENT

In support of his motion in arrest of judgment pursuant to Fed.R.Crim.P. 34, Cohen argues that none of the 11 counts of the indictment upon which he was convicted charges an offense, but he does not tell us why.[12] As a result of reexamining the indictment, and the facts, dates and statutory citations stated therein, we find that each count of the indictment is sufficient as a matter of law to charge Cohen with the offenses for which he stands convicted. Accordingly, Cohen's motion in arrest of judgment will be denied.

An appropriate Order will be entered.

---

12. Cohen's motion states that Counts 1, 2, 6, 7, 8, 9, 10, 12, 13, 19 and 20 do not charge an offense. Cohen did not file a memorandum of law in support of his motion in arrest of judgment and did not, at oral argument, offer any specific facts or arguments to support his assertion.