UNITED STATES of America

v.

Kenneth Joseph FROMAL.

Crim. No. 89–00310.

United States District Court,
E.D. Pennsylvania.

March 9, 1990.

Mary Crawley, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

James A. Lammendola, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

In a criminal jury trial held from November 27, 1989 to November 28, 1989, the defendant, Kenneth Joseph Fromal, was found guilty by the jury of possession of a firearm by a convicted felon, under 18 U.S.C. § 922(g)(1). The defendant has filed post-trial motions seeking a new trial under Fed.R.Crim.P. 33 and judgment of acquittal under Fed.R.Crim.P. 29. After a review of the briefs of counsel, record, and applicable law, we find that we must deny defendant's motions. The motions rest on eight alleged errors by the court:

1. Failure to grant the Defendant's Motion to Dismiss the Indictment on the grounds of pre-indictment delay, violation of the Defendant's rights pursuant to the Speedy Trial Act and for violation of the Interstate Agreement on Detainers.

2. Failure to grant the defendant's Motion to Suppress incriminating statements made by the Defendant as the result of an illegal arrest effectuated without probable cause.

3. Denial of the Defendant's Motion to Suppress incriminating statements which were made in violation of the Defendant's Miranda rights.

4. Denial of the Defendant's Motion to Suppress physical evidence which was obtained by police officers utilizing a search warrant which was issued without probable cause and a search warrant which was defective in that it failed to describe with particularity the items to be seized and the place to be searched and in that the physical evidence seized exceeded the scope of the warrant.

5. That the verdict was contrary to the weight of the evidence and the evidence was insufficient to support the verdict.

6. Failure to grant Defendant's Motion in Limine concerning the Government's use of the Defendant's prior robbery charge for impeachment purposes.

7. Failure to charge the jury on the requirement of specific intent as being a necessary element of the crime of possession of a weapon by a convicted felon.

8. Failure to charge the jury on the issue of voluntariness with respect to certain incriminating statements made by the Defendant after his arrest.

With regard to the motion for judgment of acquittal, under Fed.R.Crim.P. 29, it is well settled that: "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In making this determination, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Coleman*, 862 F.2d 455, 460–61 (3d Cir. 1988), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). For a judgment of acquittal to be granted, the court must decide, as a matter of law, that the evidence presented at trial was insufficient to support the conviction. "In reviewing testimony for determining a Rule 29 motion, questions of the weight of the evidence or of the credibility of the witnesses are foreclosed by the jury's verdict." *United States v. Cohen*, 455 F.Supp. 843, 852 (E.D.Pa.1978), *aff'd*, 594 F.2d 855 (3d Cir.1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2169, 60 L.Ed.2d 1050 (1979).

The standards a court must apply in ruling on a motion for new trial are equally well known. We are guided by the language of the court in *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1989):

Motions for a new trial are directed to the broad discretion of the trial judge, who may weigh the evidence and evaluate the credibility of witnesses in considering such a motion. *United States v. Leach*, 427 F.2d 1107, 1111 (1st Cir.) *cert. denied sub nom. Tremont v. United States*, 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970).

\* \* \* \* \* \*

The remedy of a new trial is sparingly used, and then only where there would be a "miscarriage of justice ... and

where 'the evidence preponderates heavily against the verdict.'" *United States v. Leach, supra*, at 1111.

Before we begin our review of defendant's motions and the factual background, we further note that although exceptions are now unnecessary, to properly preserve an issue a party must either object or otherwise inform the court of the action which a party desires. Fed.R.Crim.P. 51. Similar more specific rules apply to the court's rulings on evidence, Fed.R.Evid. 103, and instructions to the jury, Fed.R.Crim.P. 30. With these standards in mind, we shall review the relevant facts:

## FACTUAL BACKGROUND

On November 20, 1987, an armed robbery of the Bank of Lancaster County's branch in Quarryville, Pennsylvania was reported to the Pennsylvania State Police. Witnesses described the robber as a white male, 5′3″ to 5′6″, medium build, with hazel eyes, wearing a grey ski hat with eye holes cut in it over his face. The gun used by the robber was described as a silver colored handgun, possibly a toy. According to several witnesses, the robber fled the bank with the money (later found to be $18,-994.00) in a full-sized maroon car. In addition, a teller in the bank, Jean Aukamp, the following day, told the police that she was 90% sure that the voice of the robber was that of the defendant, Kenneth Joseph Fromal, based on the defendant's frequent patronage of the bank.

On November 24, 1987, the Pennsylvania State Police and Special Agent Dan Harelson of the Federal Bureau of Investigation interviewed Lynn Fromal, the defendant's wife. Without telling Mrs. Fromal the purpose of their questioning, these authorities simply asked her to describe her husband and his recent activities. Mrs. Fromal described the defendant as 5′6″ tall, with hazel eyes that turned grey when he was angry or excited. Mrs. Fromal said that she was separated from her husband and that he had been living with his brother Tom in Oxford, Pennsylvania, since the recent sale of the house owned by defendant and Mrs. Fromal.

Mrs. Fromal said she saw the defendant leave his brother's house at 9:30 or 10:00 a.m. on November 20, the day of the robbery, and return around 6:00 p.m. that evening, in his burgundy Oldsmobile. According to Mrs. Fromal, when she asked where he had been all day, the defendant told her that he had been looking for apartments. She found this strange, she said, because the defendant had recently begun talking about taking the two children and moving to Florida. In fact, Mrs. Fromal said, the defendant had a moving van at his brother's house, and had told her he planned to leave as soon as he got it loaded, probably on Friday, November 27. Mrs. Fromal said she had seen the word "Bargin" on the side of the van. Mrs. Fromal also remembered that on the evening of November 20, the defendant had offered to trade cars with her, giving her only a few minutes to make up her mind. Finally, Mrs. Fromal stated that the defendant told her on Sunday, November 22, that he had more money than he thought he had from the sale of their house, around $15,000 or $20,000.

Early on November 25, personnel from a truck rental business called "The Bargain Rental" advised the State Police that one Thomas Clark Fromal had rented a Ford Econoline van on November 23. Mrs. Fromal confirmed that the address Thomas Fromal gave "The Bargain Rental" was the address of defendant's brother, Thomas Fromal, and was where the defendant had been staying since she and the defendant had sold their house.

Being advised of the possibility that the defendant might leave the state shortly, the State Police decided to arrest defendant Fromal on Wednesday, November 25. Trooper Peter Chimienti applied for an arrest warrant and search warrants for the defendant's Oldsmobile, the moving van and the home of the defendant's brother, Thomas Fromal. In the meantime other State Police officers and F.B.I. Special Agent Harelson went to the vicinity of Oxford, Pennsylvania, to look for the defendant. Shortly after noon, the defendant's car was spotted at a farm or business on Pennsylvania Route 472 by Special Agent Harelson. He notified the State Police, who came to the scene. The police and the Special Agent waited until the defendant started driving south on Route 472, and then, at 12:25 p.m., Pennsylvania State Trooper Raymond E. Solt stopped the defendant and arrested him. Special Agent Harelson was in a separate car from the State Police, and while he observed the arrest, he did not take part in it.

Trooper Solt identified himself and informed defendant that he was being arrested for the bank robbery at the Bank of Lancaster County. He then read defendant his Miranda rights, using a card furnished by the District Attorney's office. The technical accuracy of the wording on the card has not been disputed. Defendant Fromal, who has attended college, indicated that he understood his rights. He was asked whether he acquiesced in a warrantless search of the automobile. The defendant said that he would wait and decide later whether to permit a search of the automobile. No search of the automobile was made at that time. Defendant did tell the Trooper that there was a bag of money under the front seat. When inspected, the bag was found to contain between $3,000 and $4,000. Defendant also asked the Trooper to get him cigarettes from under the front seat, which the Trooper did.

At the time defendant was arrested, he had with him in his car his children, Jennifer, aged two, and Brian, aged four. They became upset when their father was arrested, and he was allowed to speak to them to reassure them. Defendant was transported to the Avondale Barracks of the State Police in one car, and the children were brought in another. During the subsequent interrogation of defendant Fromal, the children were sometimes in the same room with him and sometimes in an adjacent room. The defendant and his children were allowed to eat lunch together. At some time during the afternoon, the children were taken away by defendant's relatives.

The defendant arrived at the State Police barracks in Avondale at approximately 12:57 p.m. Shortly after arriving at the State Police Barracks the following took

place, according to defendant's testimony at the suppression hearing on November 27, 1989. Assistant United States Attorney Mary Crawley cross-examined the defendant as follows:

Q. You informed him in the trunk of your car on the left side in a box under a flashlight you had a gun. You said it was a revolver, silver colored, and that you believed it was a .32–caliber weapon. You said you purchased it from your brother on November 23, 1987. Did you make a statement basically giving the substance of what he said? Is that true what I just read to you?

A. That's Trooper Solt's rendition of what I said. That's not what I actually said.

Q. Could you tell the Court what you actually said?

A. Trooper Solt said they were processing warrants to search a moving van, a van, my car and my brother's house. And he had mentioned previously that there was a gun involved that had been used to threaten someone. When he said that I said "Oh, my god, you may find a gun, you might find a gun in the trunk of my car." He said "What kind of gun?" I said "I don't know." He pointed at his gun, he showed me his gun or he showed me a gun and "Is it like this?" And I think I said "No." Then he pointed to a railing that was behind me that was a, a chrome railing and he said "Is it that color?" and I said "Yes."

(Transcript of Suppression Hearing November 27, 1989, pp. 43 and 44).

There is some dispute in the suppression hearing testimony about when defendant asked for the services of an attorney. The defendant claimed he asked for an attorney at about 1:35 or 1:40 p.m. The defendant further testified that he requested an attorney before he made the statement concerning the location of the gun. (Transcript of Suppression Hearing, November 27, 1989, p. 39).

Trooper Solt, on the other hand, testified at the suppression hearing that the defendant did not ask for an attorney until around 5:30 p.m. when he got to the ar-raigning Magistrate (Transcript of Suppression Hearing, November 27, 1989, p. 22) and that the statement about the gun was made at 1:12 p.m., fifteen minutes after defendant arrived at the Avondale Barracks (Transcript of Suppression Hearing, November 27, 1989, p. 28). The defendant did not contradict this testimony when it was given again at trial.

Trooper Solt testified at trial that the defendant had blurted out that he knew there was a gun in the trunk of his car, that the defendant believed it was a .32 gun, and stated that it was purchased from his brother. At trial, the defendant admitted blurting out the remark, but claimed his brother had put the gun in his car as collateral for a loan instead of selling it to him, and that he thought the gun being in the car was a possibility. The defendant, under direct examination by his own counsel, James A. Lammendola, Esq., testified at trial as follows:

Q. You heard Trooper Solt testify that you had said to him or that what was said was that you believed that there was a .32–caliber gun in the car that was purchased from your brother; is that statement correct or false?

A. That's not what I said.

Q. What did you say?

A. I said "Oh, my God, you might find a gun in the trunk of my car."

Q. What made you think there might be a gun in the trunk of your car?

A. Well, I was moving from my brother Tom's house right around that period of time and I had packed uh, a rental van, a moving van, uh, a van that I own and a car, my car. And during the course of packing those vehicles uh, Jimmy ...

Q. Who is Jimmy, Jimmy who?

A. My brother's son, uh, wanted to borrow some money off me, and I said no because I was moving and I didn't know if I'd see him again. I was moving to Lancaster. And I was giving the children things to put into the van and into my car and I was separating my things from Tom's and Jim's, making sure that everything that was put in the vehicle was actually mine, my wife's or my chil-

dren's. And Jim came back and, and he was pretty persistent about loaning him the money. And I don't know how many times he came back, but eventually I gave him the money. And he had mentioned a gun during the course of those conversations, and I told him I wasn't interested in, in a gun. And, uh, I'm sorry, I forgot your question.

Q. Did you purchase this gun ...

A. No.

Q. ... from anybody?

A. No

Q. Is that your gun?

A. No.

MR. LAMMENDOLA: I have no further questions.

THE COURT: You may inquire.

## CROSS EXAMINATION

BY MS. CRAWLEY

Q. Mr. Fromal, on the day you were arrested you do not deny that you were given your Miranda warnings by Trooper Solt, do you?

A. No, I don't deny that.

Q. And you do not deny that you understood those at the time, do you?

A. I think I understood them.

Q. And after you got those warnings you do not deny that you mentioned a gun ...

A. No, I don't deny ...

Q. In your car?

A. I don't deny that, no.

Q. Now, you said your nephew had mentioned a gun to you?

A. Yes.

Q. And that you were not interested?

A. That's true.

Q. Do you mean that he said that he wanted to sell it to you?

A. Not really. He wanted to give it to me as collateral for the loan.

Q. How big of a loan had he wanted from you, Mr. Fromal?

A. $125.00.

Q. Did you take the gun as collateral?

A. No, I didn't.

Q. Then why did you think it would be in your car?

A. Well, Jimmy was pretty persistent and when I did give him the money he said something like "We're square now" or something like that. It didn't really penetrate my conscious at the time, but then while Trooper Solt was questioning me it just popped out that if there was anything incriminating in my car it might be that, if it was there.

Q. So when Trooper Solt questioned you you realized that you had a gun in your car?

A. I realized that I was in trouble and that I better not have anything that's incriminating.

Q. But you realized at that point that you might have a gun in your car, is that not correct?

Q. I thought it was a possibility.

(Transcript of Trial, November 28, 1989, pp. 56–59).

At approximately 3:25 p.m. when the warrants were fully processed, Trooper Chimienti read the arrest warrant to the defendant. At this time, the defendant was told that search warrants had been authorized to search his car, the moving van, and his brother Thomas Fromal's house. The defendant's car was searched at 4:37 p.m. The defendant was arraigned on the state bank robbery charge at approximately 5:30 p.m. at the office of District Magistrate Joseph M. Bledsoe in Quarryville, PA.

On May 3, 1988, a Federal complaint and warrant were filed against the defendant on the Federal gun possession charge that is the subject of this case. On May 12, 1988, a Federal detainer was lodged against the defendant, who was then in Lancaster County prison. On June 9, 1988, the defendant wrote to the Lancaster Prison warden, requesting that he notify the appropriate prosecuting officials that the defendant wished a final disposition of the Federal charge against him. On May 30, 1989, the Lancaster County Court of Common Pleas imposed upon the defendant a seven and a half to fifteen year sentence for the bank robbery charge. On August

8, 1989, the defendant was indicted on the Federal gun possession charge, and the trial date set for November 13, 1989. The Court held a suppression hearing on November 13, 1989 and immediately prior to trial on November 27, 1989. As already noted, defendant was tried on this charge on November 27 and 28, 1989, and found guilty by a jury.

## DISCUSSION

We will now deal with the alleged errors raised by the defendant.

1. *Failure to grant the defendant's motion to dismiss the indictment on the grounds of pre-indictment delay, violation of the defendant's rights pursuant to the speedy trial act and for violation of the interstate agreement on detainers*

These issues were considered and discussed in our Opinion and Order dated November 20, 1989 denying this same motion. Defendant has made no material arguments in connection with the present motions that were not considered by us when that Opinion and Order were issued. Consequently, for the reasons given in that Opinion we find that the motion to dismiss the indictment was properly denied by the court prior to trial.

2. *Failure to grant the defendant's motion to suppress incriminating statements made by the defendant as the result of an illegal arrest effectuated without probable cause*

This is essentially a factual issue. The arrest was made before the arrest warrant was issued. Did the police officers who made the arrest have probable cause to make a warrantless arrest?

The probable cause determination was made by Trooper Chimienti, who conveyed that determination, along with his reasons for it, to Trooper Solt, who made the arrest. While Trooper Solt was in the field making the arrest, Trooper Chimienti was applying for an Arrest Warrant and Search Warrants in connection with the arrest. The best source for determining what Trooper Chimienti knew at the time he made the probable cause determination can be found in the application for the Search Warrant for defendant's Oldsmobile, which is found in the record as an attachment to the Government's Response to Defendant's Motion to Suppress and was entered into evidence at the November 13, 1989 suppression hearing as Government Exhibit 5. That application contains twenty-seven short paragraphs, attested by Trooper Chimienti. It contains, among other things, the following paragraphs:

1. On 20 Nov 87 an Armed Robbery was reported to PSP Lancaster through Lancaster County radio. Robbery occurred at the Bank of Lancaster County 101 E. State St. Quarryville, Pa at approx 1510 hrs.

2. Jean AUKAMP head teller of the bank gave the following account. The guy was short about 5'3 to 5'6" tall, med. build. His hands were not covered and he was white. He had a grey knit hat that was pulled down over his face and neck and tucked into his shirt or jacket. His jacket was tan or khaki color. His eyes looked grey like the grey hat. The knit hat had two holes cut into it like he did it himself.

4. AUKAMP stated, the whole time the robbery was going on I kept saying to myself, "I know that voice, I know that voice. Friday night I went to bed praying the name would come to me that fit the voice. At 2:30 A.M. I woke and either dreamed it or just woke up, but I heard his voice and saw his face. It was Ken FROMAL. I'm 90% sure it was him.

5. I know his voice and everything from coming in here. He is a customer and has an account here. Everything else matched his physical size and everything.

6. After the guy left the bank, within one or two minutes I went out the back door and did see a full size maroon car going up Hess St. with one person in it.

8. DOROTHY WEAVER Strasburg, Pa. stated, "I pulled into the bank in the front and there setting beside me on my left in front of the bank was a big long dark colored car with one guy setting in

it. He had the motor running. I went in and made my deposit and when I came out he was still setting there. It must have been a 4 door because it was big and long.

9. Lynn FROMAL interviewed 24 Nov 87 stated, "Ken is about 5'6" tall. His eyes are normally hazel like but when he is mad or excited they change to a steel grey color. Friday 20 Nov 87 I went down to where Kenneth is staying with his brother, at Toms house in Oxford. I got there about 9:30 or 10:00 A.M. and Ken left with the burgundy car he just bought about two weeks ago. I think its an Oldsmobile, Its a huge car, and an older model. I'm pretty sure its 4 door.

10. He was talking about moving to Florida for the past weeks or so. He got back Friday about 6 P.M. and I said where were you for 7 or 8 hours and he said he was looking for apartments. He said he had a realtor showing him around. Then within a few minutes he said, "I have a proposition for you. Why don't we trade cars. I'll take the chev wagon since it has payments on it and you can have the Burgundy car I just bought, its paid for. He said I'll give you a few minutes to make up your mind.

11. When he left Friday he had a beige or tan jacket on that had some stripes in the front. He probably had jeans or tan pants on. Thats about all he wears.

12. Ken is a compulsive gambler. He plays black jack at Atlantic City alot. He told me shortly before Friday the 20th that he won big at Atlantic City. Then Sunday the 22nd. he said to me that he had more money than he thought he had. I said what do you think you have $5,000 or what. He said I probably have about 15,000 or maybe 20,000 dollars.

14. When Ken took the kids two weeks ago he bought Brian two silver guns and a badge and everything. The guns have a cylinder like yours (This officer showed weapon, revolver) but the round cylinder don't turn. The barrel is long and skinny.

15. He has a moving van down there now backed in and he said he is going to Ocala, Fla. with the kids. The truck has BARGIN on the side of it. Somehow I got the feeling he is going to leave before Friday the 27, but thats when he said he is going to leave.

16. Timothy A. WHOEY 125 Green Ln. Nottingham, Pa. stated, "He was in the drive in line and saw a white male about 5'3" come out and get into a wide long maroon car. Thinks it was a 4 dr. Pretty sure it had Pa. registration and it was a nice clean looking car. Went south on Hess St. Said the guy was middle aged and kinda had broad shoulders.

17. Bonny KAUFFMAN bank teller said she went out to the kitchen area of the bank and looked out the window and saw a large maroon car 4 dr. going south with one person in it.

[Bonny KAUFFMAN's testimony was amplified by a subsequent interview, which may not have been available to Trooper Solt at the time of the arrest. This amplified testimony is recorded in paragraphs 19 and 22 of Trooper Chimienti's application for Search Warrant, and is discussed below in connection with the Motion to Suppress physical evidence.]

20. On 25 Nov 87, Tpr Raymond C. Guth, Pa. State Police, Lancaster, Pa drove by the subject FROMAL residence and observed both a burgundy/maroon, four door Oldsmobile sedan, Pa Reg. 54720CB and white Ford Econoline 350 box type truck with Pa. Reg. # YB65915 parked there. This observation was made at approx 0745 hrs. The truck/van was parked behind the residence in a cul-de-sac.

26. Lynn FROMAL also stated that on Sunday the 22nd. of Nov 87 she was at Tom FROMALS house and noticed a moving truck. She asked Ken FROMAL what he was doing with the moving truck and he replied, To put things in. She said what things, he said our stuff. She asked where are you taking them and he said probably Florida.

He took her things to a stowaway after he separated it. That was in East

Petersburg Pa. She said Ken and his Brother Tom took them there.

 A warrantless arrest on felony charges in a public place does not violate the Fourth Amendment, even though exigent circumstances do not exist, so long as the arrest is supported by probable cause. *United States v. Johnson,* 626 F.2d 753, 756 (9th Cir.1980), aff'd, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1981). Since the defendant was arrested in a public place, we need not discuss the circumstances in terms of the existence of an exigency although we believe that certain exigent circumstances were present. Probable cause exists when the facts and circumstances within the knowledge of the arresting officers are sufficient to cause a person of reasonable caution to believe that a crime has been committed and the defendant has committed it. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). But the arresting officer does not have to have personal knowledge of all the facts constituting probable cause; it can rest upon the collective knowledge of the police where there is communication between them. *See, e.g., United States v. De Los Santos,* 810 F.2d 1326, 1336 (5th Cir.1987), *cert. denied,* 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987); *United States v. Paradis,* 802 F.2d 553, 557 (1st Cir.1986).

We find that the information quoted above is more than sufficient to support the warrantless arrest of defendant Fromal in connection with the bank robbery. There is, to be sure, information given by other witnesses which differs in some detail from that given above. That is to be expected with differing perceptions by different individuals. What is significant is that several individuals gave testimony which pointed toward defendant Fromal, and the arresting officer was aware of such information. Since the arrest was supported by probable cause, there was no reason to suppress the statements given by defendant Fromal during his post-arrest interrogation on the ground of lack of probable cause for the arrest and the court's denial of defendant's motion was proper.

### 3. Denial of the defendant's motion to suppress incriminating statements which were made in violation of the defendant's Miranda rights

 It is undisputed that at the time of his arrest Trooper Solt read defendant Fromal his Miranda rights, and told him that he was being arrested on the charge of robbing the bank at Quarryville on November 20, 1987. Defendant contends that this warning was not sufficient, because defendant Fromal was also potentially subject to federal charges for possession of a weapon by a convicted felon, the charges in the instant case. At the time defendant Fromal was arrested, no such charges had been brought. Special Agent Harelson testified that the arrest on November 25, 1987 was not made by him but by the State Police. His interest was to see if defendant Fromal had been involved in other bank robberies. He asked no questions about a gun. (Transcripts of Hearings on November 13, 1989, pp. 19 and 20 and November 27, 1989, pp. 31–35). In fact, according to the portion of the transcript quoted above in the Factual Background section of this Opinion, the remark indicating that defendant Fromal knew the gun was in the car, "Oh my God, you might find a gun in the trunk of the car," came in response to a statement by Trooper Solt that they were processing a search warrant for the car. By defendant Fromal's own testimony, the remark was an explanation in response to that information, not an answer extracted by pressure or deceit. The information defendant heard was not designed to elicit an answer, nor was it the functional equivalent of a question.

The Court in *Miranda v. Arizona,* 384 U.S. 436, 444, 475, 86 S.Ct. 1602, 1612, 1628, 16 L.Ed.2d 694 (1966) recognized that a defendant may waive his Fifth Amendment rights "provided the waiver is made voluntarily, knowingly and intelligently." Thus, the relinquishment of constitutional rights must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d

410 (1986). A waiver must be made with a full awareness both of the nature of the right to be abandoned and of the consequences of the decision to abandon it. *Id.; see also Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988) and *Riddick v. Edmiston,* 894 F.2d 586 (3rd Cir.1990). Here, the State Police embraced the letter and spirit of the Miranda decision.

■ Defendant Fromal was advised of his constitutional rights at the time of his arrest by Trooper Solt. Moreover, after being advised of his Miranda rights, defendant stated that he understood them, and had no questions about his rights. Defendant was then asked whether he was willing to answer questions, and told Trooper Solt that he was. Defendant raises no claim that he was incapable of waiving his rights; rather, he contends that police elicited the waiver after "wearing him down" by allegedly ignoring his repeated requests for a lawyer. This is simply not what the record shows. The record shows that the remark providing the essential element of knowledge was made very early in the interrogation process, not in response to any question by the police, and before any request had been made for a lawyer. The defendant even admitted to blurting out the remark when the warrants were still being processed.

Moreover, it is important to note that the significance of the remark of defendant discussed above (which was twice repeated by him in open court) is not that it led to the discovery of the gun. As discussed below, the warrant for search of the car was validly issued without that remark, and considering where the gun was found, in the trunk of the car, the gun undoubtedly would have been found even without the remark. The significance of the statement is that it demonstrates that defendant Fromal *knew* the gun was, or possibly was, in the car, an essential element of the offense. At best there is only a minor issue of credibility as to which version the defendant blurted out, and either version remains equally voluntary.

We find that the remark of defendant Fromal to the effect, "Oh, my god, you may find a gun in the trunk of my car", and the remark about the caliber and purchase of the gun, was blurted out fifteen minutes into the interrogation and was not made in violation of defendant Fromal's Miranda rights. Therefore, the motion to suppress the remark on those grounds was properly denied by the court prior to trial. In addition the remark is admissible because it was voluntarily given and was not in response to a question. *See United States v. Diezel,* 608 F.2d 204 (5th Cir. 1979); *United States v. Cobbs,* 481 F.2d 196 (3rd Cir.1973), *cert. denied* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Vigo,* 487 F.2d 295 (2nd Cir.1973), *United States v. Romano,* 388 F.Supp. 101 (E.D.Pa.1975).

4. *Denial of the defendant's motion to suppress physical evidence which was obtained by police officers utilizing a search warrant which was issued without probable cause and a search warrant which was defective in that it failed to describe with particularity the items to be seized and the place to be searched and in that the physical evidence seized exceeded the scope of the warrant*

This ground has three sub-divisions, namely, the absence of probable cause, failure to describe with particularity and exceeding the scope of the search warrant. We will deal with the three sub-grounds in order.

■ The statement in support of the application for the warrant to search defendant's car, in addition to the paragraphs quoted above in connection with the motion to suppress the defendant's statements for lack of probable cause for the arrest, contained the following significant paragraphs:

3. The gun was silver in color and it looked fake to me. It had a long barrel that was real skinny. He handed me a white plastic bag that had some green or blue on it.

19. In ref. to #17 Bonny KAUFFMAN did not see the events from the kitchen window. She was at the front window and saw the subject in a full size maroon car going through the parking lot. She said Oh my god, there he goes. Car looked like an Oldsmobile from the back. This information was discovered on 25 Nov 87.

22. This affiant spoke with Bonny KAUFFMAN (mentioned in para 17) by telephone on 25Nov87 at 11:50 A.M. and she related that she was at the front doors of the bank after the robbery and she observed a large type maroon shiny car coming to the left of her and its' only occupant, the driver, still had the mask on as described in para # 2).

23. Vaughn HOPLAMAZIAN "The Bargin Rental" advised on 25 Nov 87 that Ford Econoline 350 Pa. Reg. YB65915 was rented by Thomas Clark FROMAL 2100 Limes stone Rd. Oxford, Pa. Pa. Opr. #12842015 Rented on 23 Nov 87 at 1700 hrs. had 17,243 miles. Paid with Master card and $320.00 cash. HOPLAMAZIAN said the clerk Adrinah EDGARIAN asked FROMAL what he was using the van for and he said His brother turned him onto a deal to sell dairy equipment to amishmen and he could pick up some quick cash in a few days.

24. Jean AUKAMP head teller also stated that sometime during the robbery the robber threw a note up on the counter, and when he had all the money he asked for the note back. She stated that the note was lined paper folded in 4s and had writing on it but she never got a chance to read it.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court held the Fourth Amendment's requirement of probable cause for the issuance of a warrant is to be applied, not according to a fixed and rigid formula, but rather in the light of the "totality of the circumstances" made known to the magistrate. "[T]he task of a reviewing Court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984). A magistrate's determination of probable cause should be paid deference by reviewing courts. *Illinois v. Gates, supra*, 462 U.S. at 236, 103 S.Ct. at 2331; quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

[A]ffidavits for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of criminal investigation. Technical requirements of elaborate specificity once exacted under common law have no place in this area.

*United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).

"Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants."

*Id.* at 109, 85 S.Ct. at 746.

Defendant claims that the magistrate did not have probable cause to believe that evidence of criminal activity would be recovered from the search of defendant's car. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates, supra*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. The test whether the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution to form the belief that the revolver would be found in the car. *See Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

As described in the sections we have quoted from Trooper Chimienti's affidavit, the magistrate had more than enough probable cause to issue the search warrant.

There was the first-hand observation of the bank teller that the robber had a revolver, that same teller's voice identification of the defendant as the robber, the close fit between the car observed at the scene of the robbery and the car observed at the defendant's residence, and also described by defendant Fromal's wife as being his car. There was the statement of defendant's wife that defendant had no home of his own and that he was contemplating moving in the very near future, possibly to Florida. There was the testimony of Fromal's wife that on November 20, defendant Fromal was dressed in clothing consistent with the descriptions of the witnesses, that he was driving the maroon Oldsmobile that day, that he was away from his brother's home during the period when the robbery took place and that he offered to exchange cars with her.

We find that the facts discussed above would be more than enough to give a person of reasonable caution a basis to believe that the defendant had committed the bank robbery, that he possessed the tools used in and the fruits of the bank robbery and that they could be found in his automobile, apparently the only substantial piece of property which he owned. We further find that under the circumstances of this case the information given to the magistrate was not stale but, being given only five days after the robbery and describing items likely to be retained by the defendant and in a place (the car) known to be under the control of the defendant, was timely.

■ The items to be searched for and seized are described as follows:

ONE grey knit ski type hat with eye holes cut into it. ONE silver colored pistol (handgun) /Possibly a toy gun/ thin barrel. ONE white plastic shopping type bag with colored markings on it. One paper note folded in 4s, lined with writing on it, either pencil or dark pen announcing a robbery. Large amount of U.S. Currency and Bank of Lancaster County money wrappers. Amount stolen $18,994.00

The specific description of premises and/or persons to be searched was:

Maroon or Burgundy Oldsmobile 4 dr. sedan. Yellow Pa. Reg. 54720–CB

With regard to the description of the gun, we must recall that it was based on a very short period of observation by a bank teller, not a certified gun expert, who at the time of observation doubtless had other things on her mind. It may not fit the precise description of the gun found in the trunk of defendant's car. It is possible that the gun used in the robbery was not the gun found in defendant's car. But it can hardly be said that the description was not sufficiently precise to justify the issuance of the search warrant, or to justify a police officer, searching the car pursuant to a legally issued search warrant, to take the gun into custody as evidence.

■ The ammunition seized with the gun was in plain view at the time the gun was discovered.

To justify a plain view seizure, the government must establish: 1) that the law enforcement agent was lawfully in the place where he discovered the items seized; 2) that the discovery of the items was inadvertent; and 3) that the incriminating nature of the items was immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *United States v. Scarfo*, 685 F.2d 842, 845 (3rd Cir.1982) *cert. denied* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). *United States v. Meyer*, 827 F.2d 943, 945 (3rd Cir.1987). The first two requirements of the plain view doctrine are clearly satisfied here. The officers, in executing the search warrant for the car, were required to examine the trunk and its contents. Their discovery of the ammunition not listed in the warrant was inadvertent. And the third element is met here as well: the incriminating nature of the gun and the ammunition for the gun, which might well have been used in the bank robbery which the officers were investigating, was immediately apparent.

We therefore find that the description of the gun in the search warrant met the requirements for particularity, that the gun actually seized was reasonably within the

description found in the search warrant and that even if, arguably, the gun seized did not fit the description in the search warrant, the seizure of the gun and the ammunition, found in the trunk of the car, was justified by the plain view doctrine.

With regard to the description of the place to be searched, the defendant nowhere indicates how the description of the automobile should have been more specific. I therefore find that the description of the place to be searched met the particularity requirement.

For the reasons given above, I find that the defendant's motion to suppress physical evidence obtained by illegal search and seizure was properly denied by the court prior to trial.

5. *The verdict was contrary to the weight of the evidence and the evidence was insufficient to support the verdict*

■ The only deficiency raised is the alleged failure to provide sufficient evidence that the .32 caliber Harrington and Richardson revolver entered interstate commerce, an essential element in the offense. As stated by the defendant's brief:

The sole evidence presented by the government with regard to the .32 Harrington and Richardson revolver entering interstate commerce was the testimony of Brenda Walker of the Bureau of Alcohol, Firearms and Tobacco (A.F.T.) who testified that A.F.T. records (as provided to A.F.T. by Harrington and Richardson Corporation) indicated that the Harrington and Richardson revolver was shipped from Gardner, Massachusetts to Melrose Park, Pennsylvania on March 13, 1984.

That characterization of the evidence does not fully reflect what actually happened at trial. As reflected in the Transcript of Trial, November 28, 1989, pages 25–32, the witness did the following: (A) She identified herself as a supervisor in the firearms tracing branch of the Bureau of Alcohol, Firearms and Tobacco (hereinafter "A.F.T."); (B) she described the nature of the records maintained by A.F.T.; (C) she stated that the gun manufacturing records

of Harrington & Richardson, a gun manufacturer once located in Gardner, Massachusetts, were turned over to A.F.T. in 1986, as required by law, after the firm went out of business in 1985; (D) she authenticated Government Exhibit 4 as the record of the gun in question; (E) she testified that Government Exhibit 4 showed that the gun in question was manufactured on March 12, 1984, and that it was shipped to Melrose Park, Pennsylvania on March 13, 1984; (F) she testified that she had firsthand knowledge that the only manufacturing facility of Harrington and Richardson was in Gardner, Massachusetts; and (G) she testified that Government Exhibit 1, the gun in question, has stamped upon it the words: Made in USA and H & R Inc., Gardner, Mass., USA. In addition to the evidence given by Brenda Walker, we note that it is undisputed that the gun was in Pennsylvania at the time it was found in defendant's car. We find that this evidence would support a finding by a reasonable jury that the gun in question had moved in interstate commerce prior to its seizure from defendant's car, and that defendant's remark about knowing there was a gun in his car, along with the defendant's felony conviction, was sufficient to prove the elements of the offense charged.

6. *Failure to grant defendant's motion in limine concerning the government's use of the defendant's prior robbery charge for impeachment purposes*

■ The defendant argues that the court erred in denying his oral motion in limine, which sought to prevent the government from using his prior bank robbery conviction for impeachment purposes. This contention is without merit.

Fed.R.Evid. 609(a) allows prior convictions to be used for impeachment purposes in two circumstances:

[T]he crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect

to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

Fed.R.Evid. 609(a). Here, the bank robbery conviction passes muster under both subdivisions of the rule.

First, the conviction was a felony punishable by imprisonment[1] for more than one year, and second, the crime of larceny has been held in this Circuit to involve dishonesty. *United States v. Remco*, 388 F.2d 783, 786 (3rd Cir.1968); as has robbery, *United States v. Bianco*, 419 F.Supp. 507, 509 (E.D.Pa.1976), *aff'd mem.*, 547 F.2d 1164 (3rd Cir.1977). At trial, the court performed the balancing test required by Fed.R.Evid. 609(a)(1), on the record, and found that the conviction's probative value outweighed any prejudice to the defendant. The jury already knew, as an element of the offense, that the defendant was a convicted felon and the robbery was referred to during impeachment without any mention of a gun or firearm.[2] Consequently, defendant's motion in limine was properly denied by the court during the trial.

 7. *Failure to charge the jury on the requirement of specific intent as being a necessary element of the crime of possession of a weapon by a convicted felon*

■ Defendant argues:

Although the case law at the Federal Court of Appeals level with respect to the Possession of a Gun Statute under 18 U.S.C. 922(g)(1) and (under which the Defendant was convicted) has consistently interpreted the Statute as not requiring the element of specific intent, it is sub-

mitted by the Defendant that in not requiring the element of specific intent, the Statute is unconstitutional and violates the Due Process clause of the Fifth Amendment. For this reason the learned Trial Judge erred in denying the Defendant's request to charge the jury on the issue of specific intent.

The answer to that argument is very simple. We are bound by the law of this Circuit, and as recently as December 26, 1989, the Third Circuit held as follows:

It has been held repeatedly, however, that the crime defined in section 922(g) is a crime of general intent. *See, e.g. United States v. Hatfield*, 815 F.2d 1068, 1072 (6th Cir.1987); *United States v. Weiler*, 458 F.2d 474 (3rd Cir.1972).

*United States v. Williams*, 892 F.2d 296, 303 (3rd Cir.1989). In *United States v. Weiler*, 458 F.2d 474 (3rd Cir.1972), the trial court had charged that specific criminal intent was not an element of an offense under 18 U.S.C. § 922(g). After a thorough analysis of the constitutional issue, *Id.* at 476–480, the Third Circuit concluded:

Appellant's conviction is consistent with the Gun Control Act and the Fifth Amendment to the United States Constitution.

*Id.* at 480. *See also United States v. Freed*, 401 U.S. 601, 607–610, 91 S.Ct. 1112, 1117–1118, 28 L.Ed.2d 356 (1971); *United States v. Holmes*, 594 F.2d 1167, 1173 (8th Cir.1979), *cert. denied* 444 U.S. 873, 100 S.Ct. 154, 62 L.Ed.2d 100 (1979) and *United States v. Udofot*, 711 F.2d 831, 835 (8th Cir.1983), *cert. denied* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983). Conse-

1. The only conviction which was used at trial for impeachment purposes was defendant's conviction for the 1987 bank robbery which is described in this opinion. Prior to that conviction, defendant had been convicted of burglary in Delaware County, Pennsylvania on September 9, 1966, of burglary in Delaware County Pennsylvania on July 22, 1970, of attempted interference with interstate commerce by extortion in the United States District Court for the Eastern District of Pennsylvania on May 13, 1976 and of burglary in the Superior Court of the State of Delaware on April 20, 1977. Each of these convictions was a "violent felony" as that term is defined in 18 U.S.C. § 924(e), and formed the predicate acts for the indictment

pursuant to 18 U.S.C. § 922(g)(1). They were not used at trial for impeachment purposes. This element of the offense under § 922(g)(1) was supplied by stipulation.

2. The court gave a limiting instruction in its charge:

"[Y]ou may consider that previous conviction of a robbery in determining whether or not you believe what the defendant says, but that is the only purpose for which you may consider it."

(Transcript of Trial, November 28, 1989, pp. 89–90).

quently, we find that we correctly refused to charge the jury that specific intent is a necessary element of the crime of possession of a weapon by a convicted felon.

8. *Failure to charge the jury on the issue of voluntariness with respect to certain incriminating statements made by the defendant after his arrest*

■ Defendant argues last that the court erred in refusing to give an instruction that the jury should consider whether a statement or admission made by the defendant at the time of arrest was voluntary or involuntary in the light of all the surrounding circumstances. The only such statement material to the trial of this matter was the one blurted out, shortly after the defendant had arrived at the Avondale Barracks, indicating knowledge that the gun was in his car.[3] The evidence at trial did not raise as an issue whether this remark was voluntary or not. What the evidence shows, in the testimony of the defendant at the suppression hearing, was that the remark was not made in response to a question by the police, but rather in response to hearing information that the police were in the process of obtaining a search warrant for defendant's car. The statement about the search can not be said to have been designed to elicit any response. *See* 18 U.S.C. § 3501(d); *Diezel, Supra,* 608 F.2d 204; *Cobbs, supra,* 481 F.2d 196, *Vigo, supra,* 487 F.2d 295 and *Romano, supra,* 388 F.Supp. 101. The defendant's remark was in the nature of a lame explanation. In fact, as quoted above in the factual background section of this opinion, that same remark and explanation

were made by the defendant in his testimony before the jury at trial. Therefore, no issue as to voluntariness arises. 18 U.S.C. § 3501(a) does not require a voluntariness instruction where no identifiable issue of voluntariness is raised by the evidence presented to the jury. *United States v. Sebetich,* 776 F.2d 412, 422, n. 16 (3rd Cir.1985), *cert. denied* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); *United States v. Bondurant,* 689 F.2d 1246, 1249 (5th Cir.1982); *United States v. Fera,* 616 F.2d 590, 594 (1st Cir.1980), *cert. denied* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

Moreover, defendant mischaracterizes the evidence at trial when he states (Motion, p. 10) that he testified that he was "confused at the time [of his arrest] since he was worried about his two small children" in the car with the defendant when he was pulled over. Rather, defendant testified, on cross-examination, that although he was concerned about his children, he understood clearly the Miranda warnings given to him by Trooper Solt, and that he was not obligated to answer any questions. These facts, unlike those in the case defendant cites, *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 921–22 (3rd Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), where the defendants claimed they were physically tortured for hours, do not raise an issue as to voluntariness.

In any event, while the defendant's exact proposed charge[4] was not given, the court, in an abundance of fairness, did give the following charge:

> If the evidence in the case leaves the jury with a reasonable doubt as to whether a confession was voluntarily made, then the jury should disregard it entirely.
> If, on the other hand, you find that the confession (admission) in evidence was voluntarily made, then you will give it such weight as you feel it deserves under the circumstances.
> The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

---

**3.** At trial, defendant did not offer testimony which contradicted the trial testimony of Trooper Solt that the defendant made his remark at 1:12 p.m., before he asked for a lawyer. (Transcript of Trial, November 28, 1989, pp. 5, 7, 9–11).

**4.** The Defendant Requested Instruction # 10 reads as follows:
 If it appears from the evidence that an admission was made by the Defendant at the time of his arrest, then the jury should consider whether or not such a statement or admission is voluntary or involuntary in light of all the surrounding circumstances.

Now, as I understand the defendant's position in this case, the defendant claims that the proof which is required beyond a reasonable doubt, that that burden of proof has not been met. The defendant maintains that he has presented testimony to you that at the time of the incident on November 25, 1987, that he was taken to the police station, barracks of the Pennsylvania State Police and that under all the circumstances—and I tell you you should consider all the circumstances under which these statements were allegedly made; that under all the circumstances he was nervous and upset and that he told the police at that particular time that they might find a gun there or words to that effect, but that he did not tell them that it was his gun or that he had purchased it from someone. That he believed that someone else may have placed the gun in his trunk and that is why he told the police that.

And the Government says to that that you should consider whether or not you believe this statement and whether or not you believe that the defendant is telling the truth. That, in a nutshell, is the theories of the parties as I understand them. They have been argued to you by eminent counsel for both sides. I urge you to consider those arguments;
. . .

The court felt that any further charge on voluntariness would confuse the jury because the defendant testified at trial that the remark he had made was true. The Court modeled its charge on this point on Pattern Criminal Jury Instruction 36 pub-

lished by the Federal Judicial Center, which suggests that words like "confession" and "voluntariness" not be used.[5] *See United States v. Williams*, 484 F.2d 176 (8th Cir. 1973), *cert. denied* 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 & 476

[18 U.S.C. § 3501(a)] does not specify any particular wording for an instruction on the weight to be accorded a confession; here the District Court instructed the jury on its responsibility to judge the credibility of the witnesses and weigh their testimony. We are not prepared to say that this instruction was inadequate for the purposes of 18 U.S.C. § 3501(a)
. . .

Id. at 178.

We feel, consequently, that the essential question related to voluntariness, namely, the question of the circumstances under which the incriminating remark concerning knowledge of the presence of the gun was made to the police, was covered by the court's charge in a way that was more than adequate and proper under the circumstances of this case.

For the reasons given above, none of the alleged errors raised by the defendant have merit, and his motions are all denied. The evidence against the defendant, in view of his testimony about knowing about a gun, was overwhelming and more than enough to support his conviction.

---

5. Pattern Criminal Jury Instruction 36 reads as follows:

### 36. Defendant's Confession
You heard testimony that the defendant made a statement to [e.g. the FBI] concerning the crime that is charged in this case. When you consider this testimony, you should ask yourselves these questions:

First, did the defendant say the things the witness told you the defendant said? To answer this question you must decide if the witness is honest, has a good memory, and whether he accurately understood the defendant.

Second, if the defendant, ____, did make the statement, was it correct? Here you must consider all of the circumstances under which the statement was made, including the defendant's personal characteristics, and ask yourselves whether a statement made under these circumstances is one you can rely on.

After you have answered these questions, you may rely on the testimony about the statement as much, or as little, as you think proper.

**Commentary**
The committee concluded that it is not necessary to instruct the jury about the factors enumerated in 18 U.S.C. § 3501(b).

The term "confession" is not used in the instruction, for fear that the term itself carries such strong connotations that the rest of the instruction would carry somewhat less force.